## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| COOPER (KUNSHAN) TIRE CO., LTD. and, COOPER TIRE AND RUBBER COMPANY, <br><br> and <br><br> VOGUE TYRE & RUBBER CO., <br> *Plaintiffs,* <br><br> and <br><br> ITG VOMA CORPORATION, <br> *Plaintiff-Intervenor,* <br><br> *v.* <br><br> UNITED STATES, <br> *Defendant,* <br><br> and <br><br> THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS UNION, AFL-CIO, CLC, <br> *Defendant-Intervenor.* | Consol. Court No. 20-00113 |

**DEFENDANT–INTERVENOR UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS UNION, AFL-CIO, CLC COMMENTS IN SUPPORT OF THE REMAND RESULTS**

Roger B. Schagrin
Nicholas J. Birch
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for USW*

May 19, 2022

# TABLE OF CONTENTS

I.    SUMMARY OF THE ARGUMENT ................................................................... 1

II.    ARGUMENT ...................................................................................................... 2

    A.    Commerce's Redetermination Fully Addresses This Court's Questions and Explains Why It Is Necessary for the Agency to Apply AFA as It Has....................................................... 3

    B.    Recent Commerce Decisions Rebut, Rather than Support, Plaintiffs' Arguments............. 8

    C.    19 U.S.C. § 1677m(d) Does Not Support Plaintiffs' Claims........................................... 16

        1.    Commerce fully complied with § 1677m(d)'s requirements for the relevant party....... 17

        2.    § 1677m(e)(2) makes § 1677m(d) further inapplicable to Plaintiffs ............................ 19

III.    CONCLUSION................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Archer Daniels Midland Co. v. United States*, 37 C.I.T. 760 (2013) .................................... 19, 20

*Cooper (Kunshan) Tire Co. v. United States*, 539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021)............................................................................................................ passim

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ............................. 20

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) .................... 20

*Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021).............. 15, 17

*Papierfabrik Aug. Koehler SE v. United States*, 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014).......................................................................................................... 19

*Risen Energy Co., Ltd., v. United States*, Slip Op. 22-44, Court No. 20-0391 (Ct. Int'l Trade May 12, 2022)....................................................................... 13, 14, 15

*SKF USA, Inc. v. United States*, 24 C.I.T. 822 (2000)................................................. 18

*Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001)....................................... 19

**Statutes**

19 U.S.C. § 1677e(a)................................................................................................ 16

19 U.S.C. § 1677e(a)(2)(D) ..................................................................................... 17

19 U.S.C. § 1677m(e)(2)........................................................................................... 19

19 U.S.C. § 1677m(e)(5)........................................................................................... 19

19 U.S.C. §§ 1677e(b)(1)......................................................................................... 17

**Administrative Decisions**

*Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 73,249 (Dep't Commerce Dec. 27, 2021) ........................................................................................ 10

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021)............................................. 9, 11

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review Rescission in Part, and Intent To Rescind in Part; 2019*, 87 Fed. Reg. 13,704 (Dep't Commerce Mar. 10, 2022)...................................................................................... 13

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination*, 86 Fed. Reg. 14,071 (Dep't Commerce Mar. 12, 2021) ............................................................................................ 9, 10, 11

*Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Dep't Commerce Mar. 29, 2022) ...................................... 10

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ................................................................................................ 14

*Common Alloy Aluminum Sheet From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 72,927 (Dep't Commerce Dec. 23, 2021) ........................ 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (Dep't Commerce Dec. 9, 2020) ........................................................................................................ 13

*Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2019*, 86 Fed. Reg. 73,244 (Dep't Commerce Dec. 27, 2021) ..................... 13

*Truck and Bus Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 72,921 (Dep't Commerce Dec. 23, 2021) ................................................................................ 10

iii

On behalf of Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Union, AFL-CIO, CLC, we hereby submit comments in support of the Final Results of Redetermination Pursuant to Court Remand. *Redetermination*, ECF No. 68-1. As the Department of Commerce ("Commerce") fully complied with the instructions of this Court's remand and has properly applied adverse facts available ("AFA") due to the Government of China's (the "GOC's") refusal to cooperate with Commerce's inquiry into the Export Buyer's Credit ("EBC") subsidy program, we urge the Court to affirm the remand redetermination.

## I.     SUMMARY OF THE ARGUMENT

This Court has recognized that Commerce has identified a gap in the record before it in this case that necessitates the application of facts available and may appropriately necessitate the application of AFA, due to the GOC's repeat refusal to cooperate with Commerce's examination of its EBC subsidy program. The Court remanded Commerce's determination to apply AFA to fill that gap to have Commerce answer a series of specific questions on Commerce's decision that the gap in this record is such that it prevents Commerce from verifying claims by respondent exporters that their customers did not use the EBC program.

In its redetermination, Commerce has addressed each of the Court's questions in detail. Commerce has fully explained why the information the GOC has withheld on the EBC program prevents Commerce from understanding how the program actually operates so that Commerce could conduct a meaningful verification and have reasonable confidence in its ability to recognize if the records it would need to examine did or did not contain evidence that the program was used. Commerce has explained the extensive information it would need to collect

1

from third-party customers to attempt such a verification and further explained why even with that information, Commerce would not know what exactly it should be combing through that information to find. Commerce's decision in this situation is not only fully compliant with statutory requirements on Commerce's use of AFA, it is the only reasonable way for Commerce to pursue the goals Congress had in granting Commerce the authority to apply AFA and encourage future cooperation.

Moreover, arguments against Commerce's application of AFA made by Plaintiffs Cooper and Vogue Tyre and Plaintiff-Intervenor ITG Voma (collectively "Plaintiffs") are without merit. Recant cases where Commerce has applied a different inference as the "facts available" or has sought additional information in factually dissimilar situations only serve to highlight the reasonableness of Commerce's application of AFA to the situation here, which featured no information actually from the exporters' customers who would be the actual users of the EBC program. And nothing in the statute supports Plaintiffs' claims that the statute requires Commerce to undertake considerable efforts to collect information to fill in the gap on behalf of the noncooperative GOC before applying AFA.

In sum, Commerce has fully complied with the Court's instructions on remand and has fully supported its application of AFA to the EBC program here with substantial evidence and has explained how that determination is in accordance with the law. This Court should therefore affirm Commerce's determination.

## II.    ARGUMENT

In its October 12, 2021 opinion in this case, this Court recognized that Commerce appropriately identified the gap in the record caused by the GOC's refusal to cooperate, contrary

to Plaintiffs' claims that no such gap exists. *Cooper (Kunshan) Tire Co. v. United States*, 539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021) ("*Cooper I*"), ECF No. 54 at 14. The Court further held that Commerce explained why information the GOC withheld concerning loan disbursement and partner/correspondent banks is "critical to verifying claims of nonuse" of the EBC program. *Id.* The Court remanded the matter for Commerce to address a series of six questions regarding why other information withheld by the GOC was critical to verifiability, why claims of nonuse of the EBC program by respondents were not verifiable without the missing information under Commerce's standard verification practice, and what additional information Commerce would need to attempt such a verification and whether Commerce could obtain that information. *Id.* at 38-40.

### A.    Commerce's Redetermination Fully Addresses This Court's Questions and Explains Why It Is Necessary for the Agency to Apply AFA as It Has

In its redetermination, Commerce has further explained why the GOC's noncooperation makes meaningful verification of claims regarding the EBC program impossible even if the agency were to undertake a massive effort to gather extensive additional information from respondents and all their U.S. customers. As directed by this Court, Commerce has provided a discrete answer to each of the questions posed by the Court that details the agency's reasoning and the substantial evidence supporting the conclusions reached by Commerce. *See Redetermination*, ECF No. 68-1 at 5-21. Commerce's answers provide extensive support to its original determination that the GOC's refusal to provide meaningful answers and essential information regarding the EBC program made application of AFA necessary and further made it impossible for Commerce to be able to verify claims that the program was or was not used.

Commerce's answers to the Court's questions add detail to the central theme of Commerce's application of AFA to the EBC program: that without information from the GOC that would allow Commerce to have confidence that it could recognize indicators of EBC funding, Commerce cannot have confidence in its ability to examine third-party records and verify that such funding did not occur, and certainly could not attempt any such verification without considerable additional effort on the part of the agency to collect and review enormous amounts of supplementary information. For example, in regards to the threshold requirement for EBC funding, and the fact that evidence indicates that a prior $2 million threshold was terminated at some time in the past, Commerce explained that any attempt to conduct verification of claims of a lack of EBC funding would be made much more difficult because Commerce could no longer limit the scope of a verification review to only contracts over that amount. *Redetermination*, ECF No. 68-1 at 6; *see also Cooper I,* ECF No. 54 at 22-23 (recognizing that it "may amount to a compelling reason" that  information on this threshold requirement is required for Commerce to conduct verification if the agency provides a full explanation of that reasoning). Where Commerce could before have been confident that a below-threshold contract appearing in customer records could not be related to EBC funding, now it cannot know if such contracts can or cannot be related to EBC funding. As Commerce explains, that holds true for other possible changes in the EBC program—a program that is known to have been modified since the period for which the GOC has been willing to provide any program information—so Commerce cannot know what it should be looking for to make verification a practical activity that can be completed in the statutory time constraints the agency faces to complete administrative reviews. *See Redetermination*, ECF No. 68-1 at 13-15, 25.

Commerce provides examples of comparable situations to what it faces with the EBC program to demonstrate the insurmountable difficulties if would face in trying to verify claims of nonuse in the situation it finds itself. Yet even those examples do not go far enough to fully illustrate the difficulties Commerce would face. One comparison example Commerce uses is trying to verify a tax subsidy. Typically, Commerce would be able to simply examine an annex or schedule to a tax return to verify if that subsidy did or did not appear on the respondent's tax records. *Id*. at 27. Commerce points out that if—as the GOC has done regarding the EBC program—the government in question refused to inform Commerce of where on a tax return that subsidy would be listed, Commerce likely would not be able to accurately determine use of that subsidiary by examining tax returns where the information could or could not appear. *Id.* at 28. But to be truly comparable to the situation before Commerce here, that tax subsidy would have to be one that not only may or may not appear on the tax return, but may not even be provided directly by the government and instead could come from any unknown entity, or an unknown group of other entities, directed by that government to provide the subsidy to the tax payer based on some unrevealed basis (as the EBC loan may apparently come from any number of undisclosed correspondent banks). Such unique features of the problem Commerce faces with the EBC program make it particularly unsuited to verification without full cooperation of the GOC, cooperation that the GOC has made clear it will not provide.

The exceptional problems Commerce faces with the EBC program are even more heightened by particular features of this case, as Commerce explains in the *Redetermination*. As recognized by the Court in its opinion, unlike certain other cases regarding Commerce's treatment of the EBC program, here the respondents did not provide certifications of nonuse from their U.S. customers. *Cooper I*, ECF No. 54 at 21 n. 6, 32. What respondents Shandong

5

Longyue Rubber Co. Ltd. ("Longyue") and Cooper did provide in the instant review was far removed from any certified statements from the relevant U.S. customers declaring that they did not use the EBC program during the period of review.

Longyue instead only provided emails it sent to its customers, *asking* them if they used the program. *See Redetermination*, ECF No. 68-1 at 9; *Longyue Section III Questionnaire Response*, P.R. 97 at 25. For reasons known only to it, Longyue chose not to provide Commerce with *any* of the *responses* to its email inquiries. *See Redetermination*, ECF No. 68-1 at 9; *Longyue Section III Questionnaire Response*, P.R. 97 at 25. Longyue did not even claim that all of its customers replied to its question, much less that they all replied in the negative. *Longyue Section III Questionnaire Response*, P.R. 97 at 25. Instead of providing any information from its customers, Longyue argued that it would necessarily know itself if any of its customers had used the program, based on its claims of how the EBC program must work. *Id.* But, as Commerce points out, Longyue's claims were based on the 1995 version of the EBC program; information now some 18 years out of date and not shown to be relevant to the current program. *Redetermination*, ECF No. 68-1 at 9-10; *cf. Longyue Section III Questionnaire Response*, P.R. 97 at 25.

Cooper's efforts to provide Commerce with any information on use of the EBC program were even more anemic. Cooper did not even attempt to contact any of its customers on whether they used the program, but only presented the same entirely outdated claims that it would have known of any use, again based on the now superseded former rules of the program. *See Redetermination*, ECF No. 68-1 at 9-10; *CKT (Cooper) Response To The Initial Questionnaire*, P.R. 88 at III-32.

6

While these respondents did certify the answers they did provide (*see Cooper I*, ECF No. 54 at 31-32), those answers were not based on actual knowledge. Instead, the respondents only certified that they had not been contacted regarding the program. But without the GOC's cooperation regarding the administration of the current EBC program, such declarations are irrelevant. If under the current program administration the seller is not directly contacted by some entity involved with the EBC program, respondents could make such comments in full honesty while their customers widely used the program. Whether or not such claims are meaningful is swallowed up entirely by the gap in the record caused by the GOC's noncooperation. *See Redetermination*, ECF No. 68-1 at 12 ("{G}iven that there is no current information on the record regarding the operation of the program, Commerce has no reliable understanding of what role – if any – the respondents might play in the EBCP.")

Cooper's and especially Longyue's decisions to make no meaningful efforts to provide Commerce with even basic information from their customers are inexplicable. This is particularly true for Longyue, which claims to have sent inquiries but decided not to inform Commerce about any results of those inquiries. Given that Longyue had to certify what it did submit to Commerce, limiting its response only up to the point where any customer use of the EBC program would actually be revealed to Longyue raises serious questions regarding what those responses actually were and why Longyue did not wish Commerce to know the results of its inquiry. The agency did not need to dig into those questions however, as its decision to apply AFA given the gap in the record caused by the GOC's noncooperation and the lack of any meaningful information that could fill that gap from any other party on the record was fully supported by the requirements and purposes of the statute.

Commerce also explained in its redetermination how the lack of any actual evidence from customers on this record further makes the respondents' claims unverifiable. Cooper's and particularly Longyue's response fail to show that their customers would be at all likely to cooperate with the extensive efforts that Commerce would have to undertake to even attempt meaningful verification of EBC program nonuse. Commerce would need full cooperation from all customers to assure that none used the EBC program, full cooperation that seems highly unlikely. *See Redetermination*, ECF No. 68-1 at 12, 41. Thus, this review is very unlike other instances where all relevant customers showed themselves willing to cooperate on this issue by providing certified statements of their own nonuse in the first instance. Here, Commerce could have only sought with any level of confidence to examine Longyue's and Cooper's own claims that they had not been contacted. And even if those claims could be verified (*cf. Redetermination*, ECF No. 75 at 11, explaining why verification of even these claims would be impossible), even their proven veracity would do nothing to fill the actual gap in the record that made it impossible for Commerce to determine whether or not the respondents would have been contacted if the program had been used by their customers.

**B.  Recent Commerce Decisions Rebut, Rather than Support, Plaintiffs' Arguments**

The lack of any actual evidence or involvement from the customers in this record also makes Plaintiffs' reliance, in their comments on the redetermination, on some recent Commerce determinations without merit: the contrast in situations between those cases and this case only ends up lending further support of the reasonableness of what Commerce did here.

Vogue and ITG Voma particularly rely heavily on their claims that, in recent determinations, Commerce has shown that it is able to verify claims regarding nonuse of the

EBC program and argue that these determinations show that Commerce can in fact verify such claims and that Commerce's practice on this question has changed. *See Vogue and ITG Voma Comments on Redetermination*, ECF No. 75 at 1-3, 4-8; *see also Cooper Comments on Redetermination*, ECF No. 76 at 12-13. No only are these claims inconsistent with what Commerce actually did and said in those determinations, those determinations addressed situations far from that Commerce is addressing here.

In two 2021 determinations, Commerce did apply as facts available a determination that the EBC program was not used, despite the GOC's customary noncooperation. *See Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 14,071 (Dep't Commerce Mar. 12, 2021), accompanying Issues and Decision Memorandum at 13-23 ("*Vertical Shaft Engines*"); *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021), accompanying Issues and Decision Memorandum at 49-56 ("*Mobile Access Equipment*"). Yet in both cases, Commerce was explicitly clear that these cases did not represent a change in its practice. *See Vertical Shaft Engines* at 20 ("{G}iven the constraints on Commerce resulting from the GOC's failure to provide all of the necessary information to fully understand the program's operation, Commerce cannot simply rely on the statements of nonuse …."); *Mobile Access Equipment* at 49 ("Commerce's position continues to be that the GOC is the only party that can answer questions about the internal administration of this program and that nonuse certificates cannot replace the cooperation of the GOC."). In the redetermination here, Commerce again explained how these cases do not represent a change in practice. *See Redetermination*, ECF No. 76 at 28-30. Instead, in the instances where Commerce

has made a facts-available determination of nonuse, Commerce focused unambiguously on the unique factual situations that led to those limited determinations and explained why those situations did not reflect Commerce's practice in different circumstances.

In *Vertical Shaft Engines*, Commerce in fact rejected the claim by one respondent, Chongqing Zongshen, that it was "unaware that any U.S. customer" used the EBC program (the same and only factual claim on nonuse made by the respondents in the review being considered here) and, still due to the GOC's noncooperation, applied AFA to determine the program was used. *Vertical Shaft Engines* at 20-21. And Commerce has repeatedly reached the same determination for the same reason since. *See, e.g.*, *Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Dep't Commerce Mar. 29, 2022), accompanying Issues and Decision Memorandum at 5-6; *Common Alloy Aluminum Sheet From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 72,927 (Dep't Commerce Dec. 23, 2021), accompanying Issues and Decision Memorandum at 15-29; *Truck and Bus Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 72,921 (Dep't Commerce Dec. 23, 2021), accompanying Issues and Decision Memorandum at 16-32 ("*Truck and Bus Tires*"); *Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 73,249 (Dep't Commerce Dec. 27, 2021), accompanying Issues and Decision Memorandum at 24-39 (determining use of the EBC program as AFA and holding that a "superficial email from {a} customer, {was} insufficient to demonstrate nonuse of the program.").

In *Vertical Shaft Engines*, regarding the other respondent in that investigation (Chongqing Kohler), Commerce faced a unique situation. Chongqing Kohler was able to provide full financing information for its only U.S. customer, which was also the respondent's parent company. That information provided full details on each source of financing for that parent/customer, including the lending agreements. *Vertical Shaft Engines* at 22. Commerce found that this "unique evidence" that provided "reconcilable documentation" of all loan sources showing they were "not related to the export of goods from China" "constitutes available information which can be used, for purposes of facts available," to make a determination that the EBC program was not used. *Id.* at 22-23. Even in that instance, however, Commerce again repeated that it was applying these facts as facts available in order to fill the gap left by the GOC's noncooperation, stating that the GOC's "treatment of the EBCP as a 'black box' continues to inhibit Commerce's ability to evaluate claims of nonuse and any attempts to verify company information." *Id.* at 23.

In *Mobile Access Equipment*, in an attempt to find a way to assuage concerns in other decisions of the Court that have prevented Commerce from making any response to the GOC's continued noncooperation the EBC program, issued supplemental questionnaires to two respondents who had already submitted certified statements of nonuse from all their customers. *Id.* at 49-50. In that instance, Commerce issued those supplemental questionnaires "in lieu of onsite verification to each mandatory respondent and their U.S. customers." *Id.* at 53. In the full responses received from those respondents and their customers, Commerce determined it had sufficient information to apply, as facts otherwise available, that these customers had not used the EBC program. *Id.* Commerce again, however, made clear that it was still finding that there was a gap in the record due to the GOC's noncooperation. *Id.* Commerce explained that it was

11

applying the claims of nonuse as the facts available due to the unique situation before it, where it lacked time to conduct a verification of those responses or to request further information. *Id.* at 55-56 (explaining that the countervailing duty investigation in that instance had not been extended). Commerce stated that it would have been preferable to have actually verified that information, including the information from the customers, as even the supplemental questionnaires did not provide the full information it would need to be assured of nonuse in fact. *Id.* It was only given the time constraints it faced that Commerce found it reasonable to use the still limited facts it had on that record.

Thus, Commerce has been consistent that these two cases are highly unique instances that are limited to those exceptional factual situations. *See Redetermination*, ECF No. 68-1 at 30. The claims that these cases represent any shift in Commerce's practice or policy lack factual support. And as Commerce points out, in any case those determinations, with the full information of all financing to all customers on the records, are certainly enormously different than the situation before Commerce in this case—where the record contains nothing more than emails that were sent to customers, and lacks even any answers received. *Id.* Commerce's practice remains to apply facts available to fill the gap in the record concerning the EBC program. Only where the record contains exceptional levels of information and other unique factors such as time constraints has Commerce applied as those facts available the partial information on nonuse before it. In situations such as here where the record lacked any information from a customer (or even contained some but not full information from customers), Commerce has consistently applied as facts available the inference that the program was used, for the reasons Commerce has explained in detail in its redetermination here.

12

Indeed, the only aspect that could be considered a change in Commerce's practice is that in recent investigations and reviews, still attempting to assuage the Court's concerns, Commerce has issued some supplemental questionnaires regarding the EBC program. But Commerce has only issued those questionnaires to respondents and their customers where a certified statement of nonuse had been already been submitted. *See, e.g.*, *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review Rescission in Part, and Intent To Rescind in Part; 2019*, 87 Fed. Reg. 13,704 (Dep't Commerce Mar. 10, 2022), accompanying Issues and Decision Memorandum at 17; *Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2019*, 86 Fed. Reg. 73,244 (Dep't Commerce Dec. 27, 2021), accompanying Issues and Decision Memorandum at 19 ("*Multilayered Wood Flooring*"). Indeed, that is the situation that led Commerce to seek a voluntary remand in a current case before the Court, *Risen Energy*: as the respondents there had submitted full customer certifications, Commerce sought a remand to determine if it should or could gather more information from such possibly cooperative customers. *See Risen Energy Co., Ltd., v. United States*, Slip Op. 22-44, Court No. 20-0391 at *5 (Ct. Int'l Trade May 12, 2022); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (Dep't Commerce Dec. 9, 2020), accompanying Issues and Decision Memorandum at 32.

And where Commerce has issued such questionnaires to determine if information would be provided from such apparently cooperative customers, Commerce has still not received the information it needs. In a recent determination on *Multilayered Wood Flooring from China*,

13

Commerce issued a questionnaire to a respondent that had submitted full customer certifications, seeking information on "all loans/financing of its U.S. importers/customers that were received and/or outstanding during the {period of review}." *Multilayered Wood Flooring* at 19 (indeed, Commerce in that case even issued a second supplemental questionnaire when the response to its first questionnaire failed to provide full information). But that respondent and its U.S. customers still failed to provide full information. Commerce explained that it needed that complete information to trace all loans to determine if each individual did or did not receive funds related to the EBC program. *Id*. at 27. Thus, even where Commerce has believed that it had customers that would be cooperative, it has discovered that they are much less than such when actual information is sought. And without that full information, Commerce again applied AFA to determine EBC program use. *Id.*

As discussed above, in the review here, *no* customer certifications were provided by a respondent. Commerce had no reason to waste time seeking more from such evidently uninterested third parties. Even under Commerce's expanded attempts to provide respondents an opportunity to fill the gap the GOC has repeatedly left in the record, neither respondent here would have received a supplemental questionnaire, as there was no indication that their customers even answer emails regarding the program, much less be willing to provide full and detailed financing information. This Court has recognized that the lack of customer certifications is an important distinction in cases where it has upheld Commerce's application of AFA to the EBC program. *See Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1318 (Ct. Int'l Trade 2017) (distinguishing cases where customer certifications were submitted). Commerce's action in *Risen Energy* is inapposite here, as the salient evidence of customer

willingness to cooperate that led to that outcome is prominently absent.[1] An agency later

considering an evolution in its practice on one set of facts certainly does not make its actions on

facts with an essential difference unreasonable. *See, e.g.*, *Hyundai Elec. & Energy Sys. Co. v.*

*United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021) (recognizing that Commerce need not apply

the same methodology where circumstances are different).

　　　　Moreover, these facts in this case are very dissimilar to those cases where Commerce has

found that it could apply claims of nonuse as the facts available. Those cases provided

Commerce with extensive record information that would support those claims, along with other

unique situations such as time constrains or unique relationships that further supported

Commerce's unique determinations there. This record utterly lacks such information. Instead,

Commerce here faced a record that contained only claims by the respondents that they were not

contacted about the program, and lacked any information that such contact would have been

made in any case or that even customers had informed these respondents that they had not used

the program. Not only does the record here fully support Commerce's determination that it did

not have sufficient factual information to apply the claims of nonuse as facts available to fill the

gap in the record, it demonstrates the issues that Commerce faces when it is not able to apply

AFA to fill such gaps. Where Commerce is forced to accept any claim of nonuse as a fact

whether or not nonuse can reasonably be verified without substantial additional effort by the

---

[1] Moreover, as Commerce specifies in the language from its motion for voluntary remand in *Risen Energy* cited in Vogue and ITG Voma's comments, Commerce has not in that case even determined that it will issue questionnaires to those respondents, only that it will be considering if some further action in the situation there would be appropriate. *See Vogue and ITG Voma Comments on Redetermination*, ECF No. 75 at 8 (quoting Defendant's Motion for Voluntary Remand (Mar. 28, 2022), *Risen Energy Co. v. United States*, Consol. Court No. 20-03912, ECF No. 83 at 2, 6-8).

agency, all that a foreign government has to do to prevent Commerce from addressing an advantage that government is giving its exporters is to refuse to provide Commerce with necessary information for Commerce to examine that subsidy, as the GOC has done here. Those exporters, familiar with the restraints Commerce faces, can then make unsupported and willfully ignorant claims of nonuse, knowing that whether or not the program was actually was used is no longer the issue, as just making the claim will decide the issue. Regardless of how this Court has addressed Commerce's treatment of the EBC program in factually different situations, the facts in this case strongly support the action Commerce did take and so this Court should affirm Commerce's action.

### C.   19 U.S.C. § 1677m(d) Does Not Support Plaintiffs' Claims

Recognizing the factual weakness of the record regarding the nonuse claims in this case, Plaintiffs seek to shift the blame for that weakness to Commerce. Plaintiffs argue that Commerce was required to seek more from them before it could reject their claims that their customers did not use the EBC program, and even that Commerce failed to comply with 19 U.S.C. § 1677m(d) by not doing so. *See Vogue and ITG Voma Comments on Redetermination*, ECF No. 75 at 14-16; *see also Cooper Comments on Redetermination*, ECF No. 76 at 14. These arguments are without merit.

By its plain terms, § 1677m(d) does not apply to the respondents as Plaintiffs claim. Instead, the statute directs Commerce to apply "facts otherwise available in reaching the applicable determination" where the necessary information has been withheld from it. 19 U.S.C. § 1677e(a). The statute contains no direction that Commerce must seek to expand the record to cure a noncooperative party's noncooperation. As discussed above, in this case Commerce provided an opportunity for the respondent exporters to provide what information they saw fit on

the issue, but still found it could not use even the very limited information that was submitted due to the GOC's noncooperation. *See* 19 U.S.C. § 1677e(a)(2)(D) (directing Commerce to apply facts available if information cannot be verified). The statute in no way required that Commerce go back to those respondents and beg for more than the anemic information they chose to provide.

<blockquote>

      1.   <u>Commerce fully complied with § 1677m(d)'s requirements for the relevant party</u>

</blockquote>

19 U.S.C. § 1677m(d) requires that in certain circumstances, where Commerce finds that a response to its inquiries is deficient or non-compliant with Commerce's requirements, Commerce "shall promptly inform *the person submitting* the response of the nature of the deficiency and shall, to the extent practicable, provide *that person* with an opportunity to remedy or explain the deficiency" before resorting to AFA. 19 U.S.C. § 1677m(d) (emphasis added); *see also, e.g., Hyundai Elec.*, 15 F.4th at 1081 ("Commerce must also notify the interested party of a deficiency in its response and, if practicable, provide *the party* an opportunity to rectify the deficiency." emphasis added). If *that party* continues to fail the deficiency in response to Commerce's further inquiries, Commerce may then use its authority to apply AFA. *See* 19 U.S.C. §§ 1677e(b)(1) and 1677m(d).

Here, Commerce did not find that Longyue or Cooper withheld information that Commerce had asked them for. Commerce instead specifically found that the GOC provided a deficient response to Commerce's questions regarding the EBC program.  Commerce then fulfilled the requirements of § 1677m(d) by issuing a supplemental questionnaire to the GOC. *See Supplemental Questionnaire for Government of the People's Republic of China*, P.R. 129; *Cooper I*, ECF No. 54 at 6, 17. In response, the GOC continued to refuse to cooperate with

Commerce's inquiries. *Cooper I*, ECF No. 54 at 17 ("Commerce asked the GOC for this information in its supplemental questionnaire.  The GOC refused to provide the requested information to Commerce." (citation omitted)).

By issuing that supplemental questionnaire to the party responsible for the deficient response, Commerce fully complied with the requirements of § 1677m(d). "§ 1677m(d) does not impose on Commerce a requirement that it must provide an additional notice and opportunity to remedy a deficiency, that is, issue a second supplemental questionnaire." *SKF USA, Inc. v. United States*, 24 C.I.T. 822, 835 (2000). Commerce issued a supplemental questionnaire to the GOC, offering it the opportunity to cure the deficiency in its original response—an opportunity the GOC openly rejected.

§ 1677m(d) only requires that Commerce give the party who submitted the deficient response one opportunity to remedy its response. It does not require Commerce attempt to remedy the response itself, lacking any requirement that Commerce issue further supplemental questionnaires to other parties to determine if the agency could get information from them that might fill in what the original party refused to provide. The only party § 1677m(d) had anything to do with here was the GOC, as that was the only party Commerce found had submitted a deficient response. There is no merit to the claim that Commerce had to stretch § 1677m(d) far beyond its plain terms to cover all other respondent parties before applying AFA to the GOC's response.

The fact that Commerce's application of AFA to the GOC necessarily also impacted other respondents does not change the requirements of § 1677m(d) in any way. Nothing supporting such a claim that the requirements of § 1677m(d) change based on how AFA is applied is found in the statutory language. And while Commerce is directed to seek to assuage

18

the impact of AFA on other cooperative parties, as discussed above, it is only required to do so "if relevant information exists elsewhere on the record." *Archer Daniels Midland Co. v. United States*, 37 C.I.T. 760, 769 (2013). Commerce is not required to seek to expand the record itself by seeking information from other parties or anywhere else, particularly as here where the burden on the agency would be tremendous to fill in the information it lacked to fully conduct its investigations in light of a party's noncooperation.

In sum, 19 U.S.C. § 1677m(d) required only that Commerce give the GOC, the source of the only response Commerce found to be defective on the issue of the EBC program, one opportunity to remedy that deficiency. The statute places no requirement on Commerce to seek more from other, cooperative parties than what they chose to submit. As Commerce fully complied with the statute, Plaintiffs' claims that Commerce was required to do more before applying AFA must fail.

2.   § 1677m(e)(2) makes § 1677m(d) further inapplicable to Plaintiffs

Moreover, "{t}his Court has held that the 'remedial provisions' of section 1677m(d) 'are not triggered unless the respondent has met all of the five enumerated criteria' of section 1677m(e)." *Papierfabrik Aug. Koehler SE v. United States*, 7 F. Supp. 3d 1304, 1312 (Ct. Int'l Trade 2014) (quoting *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 789 (2001)), *aff'd*, 843 F.3d 1373 (Fed. Cir. 2016). "Failure to fulfill any one criterion renders § 1677m(d) inapplicable." *Tung Mung*, 25 C.I.T. 752 at 789.

The five criteria of § 1677m(e) include the requirement that the information that has been submitted "can be verified" and "can be used without undue difficulties." 19 U.S.C. §§ 1677m(e)(2) and (e)(5). Here, the defining feature of Commerce's holding on the use of the EBC program is that the claims submitted could not be verified. Even if § 1677m(d) did apply to the

submissions of Longyue and Cooper—which it does not—because their claims regarding nonuse could not be verified without colossal difficulty to and extra effort by the agency, those claims would fail to meet all the criteria of § 1677m(e) and so the requirements of § 1677m(d) would still not be triggered.

### III.    CONCLUSION

While Commerce's response to the GOC's noncooperation unfortunately also impacts the cooperative exporter respondents, that outcome is not proscribed. Indeed, as the Federal Circuit has recognized, "a remedy that collaterally reaches {a respondent} has the potential to encourage the government of China to cooperate so as not to hurt its overall industry." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014). Thus, this outcome may be the only way for Commerce to fulfill the statutory goals of discouraging future noncooperation. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (the purpose of Commerce's authority to apply AFA is to induce cooperation). The GOC's noncooperation here has become entrenched over years as Commerce has repeatedly been unable to fully apply AFA in response, contrary to those statutory purposes.

And while Commerce is directed to apply AFA in a manner that does not adversely impact cooperative parties where possible, that directive is based on the precondition that "relevant information exists elsewhere on the record." *Archer Daniels Midland*, 37 C.I.T. at 769. If the record yet lacks that "relevant information," then prohibiting the application of AFA even if that application impacts a cooperative respondent is improper. *See Fine Furniture*, 865 F. Supp. 2d at 1262-63 (holding that it would be inappropriate to apply neutral facts where record lacked an alternative source of the information that was withheld (in that case, electricity rates)).

Here, no other party provided Commerce with the information that would have filled in the gap left by the GOC or would have made understanding of the EBC program and verification of nonuse claims possible. Commerce has provided extensive and detailed explanations of what that gap is and why it prevents the use of other information that is neutral or favorable to the other respondents.

As Commerce has thoroughly answered all questions posed by this Court in remand, has shown in detail why the GOC's cooperation prevented Commerce's ability to verify any claims about the EBC program, and as this record distinctly lacks information that would even start to provide a basis for Commerce to examine claims that U.S. customers did not use the EBC program, this Court should affirm Commerce's redetermination on remand as supported by substantial evidence and in accordance with law. Defendant-Intervenor therefor respectfully requests that this Court do so.

<div style="margin-left:45%">

Respectfully submitted,
/s/ Nicholas J. Birch_____
Roger B. Schagrin
Nicholas J. Birch
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for USW*

</div>

May 19, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| |
|---|
| COOPER (KUNSHAN) TIRE CO., LTD. and, COOPER TIRE AND RUBBER COMPANY, |
| and |
| VOGUE TYRE & RUBBER CO., *Plaintiffs,* |
| and |
| ITG VOMA CORPORATION, *Plaintiff-Intervenor,* |
| *v.* |
| UNITED STATES, *Defendant,* |
| and |
| THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS UNION, AFL-CIO, CLC, *Defendant-Intervenor* |

Consol. Court No. 20-00113

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

I, Nicholas J. Birch, hereby certify that these comments contain 6,294 words, according to the word count function of the word processing program used to prepare this brief, and therefore complies with the word limitations as set forth in this Court's February 16, 2022 scheduling order, ECF No. 71.

/s/ Nicholas J. Birch
Roger B. Schagrin
Nicholas J. Birch
Schagrin Associates
*Counsel for USW*

May 19, 2022