**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

_____

|  |  |  |
|---|---|---|
| COOPER KUSHAN TIRE CO. LTD., AND<br>COOPER TIRE & RUBBER CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| | ) | |
| VOGUE TYRE & RUBBER CO., | ) | |
| | ) | |
| Consolidated  Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ITG VOMA CORP., | ) | |
| | ) | |
| Consolidated<br>Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | Court No. 20-00113 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| THE UNITED STEEL, PAPER AND FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO, CLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____)

**DEFENDANT'S RESPONSE TO COMMENTS**
**REGARDING THE REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Email: sosunbae@gmail.com

Of Counsel:

SPENCER NEFF
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
United States Department of Commerce

*Attorneys for Defendant*

May 19, 2022

## TABLE OF CONTENTS

**PAGE**

BACKGROUND .................................................................................................... 2

    I.    The Administrative Determination Under Review ................................. 2

    II.   The Court's Remand Order and Commerce's Remand Redetermination.............. 5

ARGUMENT ...................................................................................................... 11

    I.    Legal Standards ................................................................................. 11

    II.   Commerce's Explanation Of Its Verification Process Is Supported By Substantial Evidence ....................................................................... 12

    III.  Commerce Reasonably Determined That Verification Would Be Untenable And Unduly Burdensome Without The Information From The Chinese Government ........................................................................ 14

CONCLUSION ................................................................................................... 21

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ..........................................................................11

*Bomont Indus. v. United States*,
   733 F. Supp. 1507 (Ct. Int'l Trade 1990) ..........................................................13

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
   195 F. Supp. 3d, 1334 (Ct Int'l Trade 2016) ................................................7, 17

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................................11

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ............................................................................................11

*Cooper Kunshan Tire Co. v. United States*,
   539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021) ..............................................passim

*Hung Voung Corp. v. United States*,
   483 F.Supp. 3d 1321 (Ct. Int'l Trade 2020) ......................................................13

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ............................................................................................11

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ....................................................11

*Micron Tech., Inc. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) ........................................................................15

*NTN Bearing Corp. of Am. v. United States*,
   186 F. Supp. 2d 1257 (Ct. Int'l Trade 2002) ....................................................15

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ....................................................12

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995) ..........................................................................13

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................11

19 U.S.C. § 1677e(a) .......................................................................................... 4

19 U.S.C. § 1677e(b) .......................................................................................... 5

19 U.S.C. § 1677m(d) ........................................................................................18

## REGULATIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,*
  77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) ...................................... 2

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*
  84 Fed. Reg. 16,843 (Dep't of Commerce Apr. 15, 2020) ...................................... 2

*Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China,*
  86 Fed. Reg. 14,071 (Dep't of Commerce Mar. 12, 2021) ...................................19

*Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China,*
  86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) ...................................19

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China,*
  86 Fed. Reg. 41,013 (Dept. of Commerce July 30, 2021)....................................20

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| _____ ) | |
| COOPER KUSHAN TIRE CO. LTD., AND ) | |
| COOPER TIRE & RUBBER CO., ) | |
| ) | |
| Plaintiffs, ) | |
| and ) | |
| ) | |
| VOGUE TYRE & RUBBER CO., ) | |
| ) | |
| Consolidated  Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| ITG VOMA CORP., ) | |
| ) | |
| Consolidated ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | Court No. 20-00113 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| THE UNITED STEEL, PAPER AND FORESTRY, ) | |
| RUBBER, MANUFACTURING, ENERGY, ) | |
| ALLIED INDUSTRIAL AND SERVICE ) | |
| WORKERS INTERNATIONAL UNION, ) | |
| AFL-CIO, CLC, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO COMMENTS**
**REGARDING THE REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to comments filed by plaintiffs  Cooper Kushan Tire Co. Ltd. and Cooper Tire & Rubber Co. (collectively,  Cooper Tire) and Vogue Tyre & Rubber Co. (along with plaintiff-intervenor  ITG Voma Corp.) (Vogue)

on the United States Department of Commerce's (Commerce) remand redetermination.  *See Final Results of Redetermination Pursuant to Court Order*, ECF No. 68 (Remand Redetermination);  Cooper Tire Cmts., ECF No. 76; Vogue Cmts, ECF No. 75.  Because Commerce's remand redetermination  complies with this Court's remand order in *Cooper Kunshan Tire Co. v. United States*, 539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021), and is otherwise lawful, we respectfully request that the Court sustain the remand redetermination  and enter judgment in favor of the United States.

## BACKGROUND

### I.      The Administrative Determination Under Review

This case involves various challenges to the final results of Commerce's 2017 administrative review of the countervailing duty order covering certain passenger vehicle and light truck tires (passenger tires) from the People's Republic of China (China).  *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 84 Fed. Reg. 16,843 (Dep't of Commerce Apr. 15, 2020) (final results), and the accompanying Issues and Decision Memorandum (IDM).  In the final results, Commerce applied facts available with an adverse inference (AFA) following the Chinese government's lack of cooperation, thereby finding that mandatory respondents Cooper Kushan and Shandong Longyue Rubber Co., Ltd. (Longyue) benefited from the export buyer's credit program.  *See* IDM at 13-20.

Commerce has previously found that, as part of the export buyer's credit program, the Chinese government provides customers of exporters medium- and long-term loans with preferential, low interest rates.  *See* IDM at 13; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (final determination)  and accompanying Issues and Decision Memorandum at 59.  Based

on record evidence, Commerce here determined that the export buyer's credit program operates by allowing customers to open loan accounts for disbursements through third-party banks other than the China EX-IM Bank.  IDM at 19 (finding that "credits and funds associated with the program are not limited to direct disbursements from the {China EX-IM Bank}.").

The administrative measures related to the export buyer's credit program were revised in 2013, and, as Commerce explained, these 2013 revisions eliminated a preexisting requirement that all loans provided pursuant to the program be in an amount greater than USD 2 million.  *See* IDM at 16-18; *see also* Government of China's Supplemental Questionnaire Response, P.R. 135 at 7-8.  Commerce requested that the Chinese government provide documents pertaining to these 2013 revisions, because they were relevant not only to the loan amount requirement but also to various other issues.  But the Chinese government refused to provide the information.  *Id.* at 18; *see also* P.R. 135 at 12.  Commerce also requested that the Chinese government provide a list of all partner banks involved in the disbursement of funds under the export buyer's credit program; the Chinese government refused to provide this information as well.  *See* IDM at 19; *see also* P.R. 135 at 9.

Commerce further requested that the mandatory respondents, Longyue and Cooper Tire, provide a list of all of their export customers during the period of review.  *See* Longyue's Initial Questionnaire Response, C.R. 46 at 24; Cooper Tire's Initial Questionnaire Response, C.R. 30 at 31.  In doing so, Commerce asked the respondents to "discuss in detail the role {they} play{} in assisting {their} customers in obtaining buyer credits," and to provide any documentation used to facilitate such assistance.  *See* C.R. 46 at 25; C.R. 30 at 31.  Finally, Commerce requested that Longyue and Cooper Tire explain in detail the steps they took to determine that no customer used the export buyer's credit program.  *See* C.R. 46 at 26; C.R. 30 at 32.

In response to these inquiries, Longyue gave Commerce the names and addresses of all of its United States customers and provided emails showing it contacted its customers to inquire as to whether they used the export buyer's credit program. C.R. 46 at 24-25. Longyue stated that it was never contacted by the China EX-IM Bank, or by any customers seeking assistance in obtaining loans pursuant to the program. *Id*. at 25. Longyue then stated, without further support, that Longyue's assistance is a program requirement, and claimed that it could not have benefited from the export buyer's credit program because it did not assist its customers in procuring loans. *Id*. Finally, Longyue claimed that it did not purchase export credit insurance during the period of review and, to support its contention, provided Commerce the "Detailed Implementation Rules Governing Export Buyers' Credit of the Export-Import Bank of China," dating to the year 1995. *Id*. at 25 and Exhibit 25. Longyue argued that this evidence further established that it could not have benefitted from the export buyer's credit program. *Id*. at 25.

In response to the same requests, Cooper Tire provided only a statement claiming that it was not aware of any of its customers using the export buyer's credit program during the period of review, and that Cooper Tire itself did not provide any assistance or perform any acts that would permit its customers to avail themselves of the export buyer's credit program. C.R. 30. Cooper Tire therefore expressed a belief that it none of its customers could possibly have benefitted from the program. *Id*.

While considering Longyue's and Cooper Tire's responses, Commerce found that the information it had requested from the Chinese government was necessary to verify non-use of the export buyer's credit program; because that information had not been provided and was missing from the record, Commerce relied on a factual inference pursuant to 19 U.S.C. § 1677e(a). Commerce explained that it was unable to identify which loans received by the

customers of the mandatory respondents may have been provided pursuant to the export buyer's credit program because it lacked information concerning the administration and operation of the program, such as how loans are disbursed, which intermediate banks (if any) are responsible for disbursing loans under the program, and whether the China EX-IM Bank continues to employ threshold criteria such as a USD 2 million contract value minimum. *See* IDM at 20. Commerce further stated that, without this information from the Chinese government, it would have no indicia at verification of which loans to examine, as it would not know how to determine which loans were disbursed pursuant to the export buyer's credit program. *Id.* Because the Chinese government failed to cooperate to the best of its ability, Commerce also found that it was appropriate to apply an adverse inference pursuant to 19 U.S.C. § 1677e(b). *Id.*

## II.     The Court's Remand Order and Commerce's Remand Redetermination

In October 2021, this Court affirmed in certain respects, but remanded for Commerce to, with respect to the export buyer's credit program:

> (1) explain the reason that the information withheld by the GOC about the threshold requirement and the 2013 revisions was necessary to verify non-use by describing how the missing information prevented Commerce from taking the steps that it considered necessary to verify non-use; (2)(a) explain the reason that the questionnaire statements by Cooper Tire of non-use by its customers are unverifiable by describing step-by-step Commerce's methodology for verifying non-use; (2)(b) describe the extent to which the record would enable Commerce to understand the precise role that the mandatory respondents would play in permitting customers to participate in the {export buyer's credit program}; (2)(c) describe the information that Commerce would need from the mandatory respondents and/or the customers to determine whether either the mandatory respondents or their customers used the {export buyer's credit program}; (3) explain the sources that Commerce would need to look at to complete the process of verification, including any correspondence or communications of any nature (e.g. emails, letters, faxes, telephone calls, text messages) between the mandatory respondents or their customers and the government of China, the China EX-IM Bank and partner/correspondent banks; (4) explain whether it would be feasible – and if not, why not – for Commerce to solicit and obtain the withheld information about the threshold requirement from the mandatory respondents or their customers; (5) if Commerce were to consider that obtaining and conducting a review of the sources

of information identified in "(3)", above, were unduly burdensome, explain with particularity the reasons for this conclusion; (6) explain the extent to which Commerce would be able to rely on information from mandatory respondents by explaining how, if at all, such information is relevant and reliable for Commerce to establish non-use.

*Cooper Kunshan*, 539 F. Supp. 3d at 1340-41.

In its final remand redetermination, Commerce, taking into account the comments received from plaintiffs, addressed each of the Court's requests, in turn:

*(1) explain the reason that the information withheld by the GOC about the threshold requirement and the 2013 revisions was necessary to verify non-use by describing how the missing information prevented Commerce from taking the steps that it considered necessary to verify non-use;*

With respect to this issue, Commerce explained that its verification process would require it to review a company's subledgers detailing all of the company's financing, before identifying subledgers associated with the specific loan program (here, the export buyer's credit program) and selecting specific entries from those subledgers for further scrutiny. *See* Remand Redetermination at 5. Commerce further stated that an understanding of whether contracts exceeding USD 2 million are permitted by the export buyer's credit program is necessary for Commerce to be able to "intelligently determine on which loans to focus its attention." *Id.* at 5. Commerce elaborated that, if the export buyer's credit program continues to be limited to USD 2 million contracts, such a limitation would "greatly limit{} the universe of potentially relevant loans under the program and can significantly assist {Commerce} in targeting {its} verification of non-use." *Id.* at 6. Conversely, if the USD 2 million threshold were to no longer apply, such a change would "increase the difficulty of certifying loans without any such parameters limiting the loans to scrutinize." *Id.* Further, given such a change, Commerce could "mistakenly limit {its} verification to only larger loans received by the customer, and potentially miss smaller loans that may have been disbursed under the {export buyer's credit program}." *Id.* Finally,

Commerce explained that, in addition to the USD 2 million threshold requirement, the 2013 revisions contained information that could have guided Commerce to the relevant transactions at verification.  *Id.* at 7-8.

*(2)(a) explain the reason that the questionnaire statements by Cooper Tire of non-use by its customers are unverifiable by describing step-by-step Commerce's methodology for verifying non-use;*

With respect to this issue, Commerce reiterated that its verification process would require the review of all of a respondent's subledgers, including any supporting documentation tied to those subledgers, for "any indicia of EX-IM Bank involvement."  *Id.* at 8-9.  Commerce then explained why it could not have verified non-use based on the evidence proffered by Longyue and Cooper Tire.  *Id.* at 9-11.  As Commerce stated, it could not have verified non-use based on purchases of export insurance, as proposed by Longyue, because it is unclear whether the 2013 revisions continue to require beneficiaries of the export buyer's credit program to purchase export insurance.  *Id.* at 10.  Commerce further explained that it could not verify claims that a respondent *did not* receive correspondence from its customers regarding the export buyer's credit program, or that a respondent's customers *did not* maintain any correspondence with the China EX-IM Bank or its partner banks, and that doing so would be "outside of the reach of ordinary auditing procedures," because it would require Commerce to "confirm that it has been told about all interactions with the EX-IM Bank or other banks (such as the partner/correspondent banks)."  *Id.* at 10-11.  Commerce therefore concluded that there would be no way to verify non-use based on a lack of communications, as proposed by the mandatory respondents.  *Id.* (citing *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d, 1334, 1355 (Ct Int'l Trade 2016)).

*(2)(b) describe the extent to which the record would enable Commerce to understand the precise role that the mandatory respondents would play in permitting customers to participate in the {export buyer's credit program};*

With respect to this issue, Commerce explained that it currently lacks the means to fully understand what role, if any, respondents play in permitting customers to avail themselves of the export buyer's credit program. *Id.* at 12. Commerce emphasized that, without access to the Chinese government's 2013 revisions, there is insufficient evidence on the record to support a finding as to whether the mandatory respondents participated in the process of receiving benefits pursuant to the export buyer's credit program. *Id.* at 13. Commerce also found that the Chinese government had failed to provide a sample application document that Commerce had requested, which might have shed light on the role that respondents play in the program. *Id.*; *see also* Government of China's Initial Questionnaire Response, P.R. 73 at 129.

*(2)(c) describe the information that Commerce would need from the mandatory respondents and/or the customers to determine whether either the mandatory respondents or their customers used the {export buyer's credit program};*

With respect to this issue, Commerce explained that, although it would need to request all forms of financing received by the mandatory respondents' customers, this information would still be of limited use for Commerce to be able to verify non-use of the export buyer's credit program. *Id.* at 13-14. Because Commerce lacks necessary information from the Chinese government, it would still be unable to verify non-use of the program, even with the financial information from the respondents' customers. *Id.* at 13. Commerce also stated that, because it "does not have subpoena power and, thus, cannot compel a third-party's participation in a proceeding," any attempt at verification would be unlikely to garner cooperation from all customers of all respondents to a given proceeding. *Id.* at 14. Thus, in such a scenario,

Commerce "would still have to consider applying {adverse facts available} in determining usage of the {export buyer's credit program}." *Id.*

*(3) explain the sources that Commerce would need to look at to complete the process of verification, including any correspondence or communications of any nature (e.g. emails, letters, faxes, telephone calls, text messages) between the mandatory respondents or their customers and the government of China, the China EX-IM Bank and partner/correspondent banks;*

With respect to this issue, Commerce explained that it would not be able to verify non-use by reviewing communications between mandatory respondents or their customers and the government of China/China EX-IM Bank/partner banks. *Id.* at 14-15. As Commerce stated, such communications would be of little value when verifying the non-use of a program such as the export buyer's credit program, because the verification would require Commerce to confirm the total absence of any communications between these parties. *Id.* Commerce also reiterated that, because it remains unclear whether communication between respondents and the China EX-IM Bank is even required to receive a benefit under the program, the absence of communications between those parties, if verifiable, may not even demonstrate non-use. *Id.*

*(4) explain whether it would be feasible – and if not, why not – for Commerce to solicit and obtain the withheld information about the threshold requirement from the mandatory respondents or their customers;*

With respect to this issue, Commerce explained that it "does not know how the respondents or their customers would obtain copies of the 2013 administrative measures," given that the respondents claim not to have used the export buyer's credit program. *Id.* at 16-17. Commerce added that the Chinese government itself has stated that the EX-IM Bank guidelines are internal to the bank and not available for release, further supporting a finding that the mandatory respondents and their customers would not be able to provide Commerce such information. *Id.* at 16; *see also* P.R. 135 at 9.

*(5) if Commerce were to consider that obtaining and conducting a review of the sources of information identified in "(3)", above, were unduly burdensome, explain with particularity the reasons for this conclusion;*

With respect to this issue, Commerce reiterated that, even if it were able to review all of the communications between mandatory respondents and/or their customers and the government of China/the China EX-IM Bank/any partner banks, such a review would not necessarily be reliable because Commerce could not ensure that the information received was representative of all communications between these parties, and because it would still be unclear whether communications between these parties would even be necessary for the respondents to receive funding under the export buyer's credit program. *Id.* at 17-18. Commerce explained that the "simplest and most straightforward means of verifying would involve the GOC allowing Commerce unfettered access to the EX-IM Bank's database," adding that "{t}he GOC has repeatedly denied that access." Remand Redetermination at 19.

*(6) explain the extent to which Commerce would be able to rely on information from mandatory respondents by explaining how, if at all, such information is relevant and reliable for Commerce to establish non-use;*

With respect to this issue, Commerce explained that none of the information provided by the respondents (including statements of non-use, emails to customers inquiring about usage, claims that loans would not have been provided to their customers without the respondents' knowledge, and claims that export insurance would have been required to benefit from the program) would provide "a reliable basis for verification without additional cooperation from the {Chinese government}." *Id.* at 20. Commerce also restated that it has no way of confirming that it has received the full universe of communications between the customers and the respondents, nor a way of knowing whether communication between the respondents and their customers is even required to receive a benefit pursuant to the export buyer's credit program. *Id.* Further,

Commerce specified that the non-use statements received by both respondents are, in addition to being unverifiable, unreliable, because they are not statements that have been signed by the customers themselves. *Id.* at 21.

## ARGUMENT

**I.    Legal Standards**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). The Court upholds Commerce's determination if it is supported by "substantial evidence on the record" and otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (cleaned up).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-*

*Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

## II.   Commerce's Explanation Of Its Verification Process Is Supported By Substantial Evidence

Commerce complied with the Court's remand order, addressing each of the questions posited by the Court, and demonstrating why it should continue to apply AFA given the lack of cooperation from the Chinese government.  As part of its analysis, Commerce sufficiently explained its verification process, and why a verification would most likely be insufficient to find non-use, absent the requested information from the Chinese government.

In responding to the Court's questions, Commerce described how it would conduct verification of respondents' customers to confirm that they did not use the export buyer's credit program.  To start, it would issue a questionnaire to the customers requesting all forms of financing during the period of investigation so that it could tie this information to the customers' financial statements/tax returns.  *See* Remand Redetermination at 5.  Commerce would then review the forms of financing, and determine which ones are potentially loans provided pursuant to the export buyer's credit program.  *Id.*  As explained in the remand redetermination, the hypothetical verification would fail at this stage, because Commerce would be unable to identify, absent the additional requested information from the Chinese government, which loans are part of the export buyer's credit program, because Commerce lacks an understanding of the program and needs, at the least, a list of partner/correspondent banks to look for.  *Id.*  In the absence of such information, Commerce would be required to ascertain that *every* loan received by the respondents' customers was not provided pursuant to the export buyers' credit program – a result that would be unduly burdensome, if not impossible, to carry out with a "tolerable degree of accuracy."  *See* Remand Redetermination at 19; *see also Cooper Kunshan*, 539 F. Supp. 3d at

1332 ("The Court has found that Commerce's limited resources may constitute a legitimate constraint to verification.") (citing *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995)).

Cooper Tire and Vogue present several arguments alleging that Commerce mischaracterized the nature of its verification process in its remand redetermination. Vogue claims that Commerce would not need to request that mandatory respondents' customers report all forms of financing in order for it to verify non-use of the export buyer's credit program. Vogue Cmts. at 9-11 (citing Remand Redetermination at 13). In support of this contention, Vogue first asserts that Commerce does not request all loan documentation in questionnaires to respondents in market economy countries. *Id.* at 10. Notwithstanding the fact that this argument is inapposite, given the instant review concerns a *non-market* economy, this argument still proves little, as it relates only to the information that Commerce collects in its *questionnaires*. Here, Commerce did not ask respondents to report the entirety of their financing, but only asked for selective information regarding use of the export buyer's credit program. *See* C.R. 30 at 31-32. This Court has recognized that completeness, along with accuracy, is one of the purposes of Commerce's verification. *See, e.g., Hung Vuong Corp. v. United States*, 483 F.Supp. 3d 1321, 1335 (Ct. Int'l Trade 2020) (citing *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990)). Accordingly, Vogue is mistaken in claiming that Commerce does not typically require parties to report all forms of financing for verification; such a practice would belie Commerce's goals of accuracy and completeness.

Cooper Tire argues that "Commerce's claim that it cannot solicit information from customers or third parties is inconsistent with its practice." *Id.* at 7-9; citing Remand Redetermination at 14. This assertion appears to be based on a misinterpretation of a statement

made by Commerce in its remand redetermination.   Commerce stated, correctly, that it cannot *compel* a non-party's participation in a proceeding because it lacks subpoena power.  Remand Redetermination at 14.  But Commerce did not state that it could not solicit information from a non-party, and it detailed at length the information that it would need to solicit from the respondents' customers to attempt to verify non-use of the export buyer's credit program.  *Id.* at 13-14.  But simply because Commerce can request such information does not mean that Commerce has the power to *compel* non-parties to respond.

Regardless, Commerce's ability to solicit information from third parties is immaterial to its overall findings.   Because the information that Commerce would receive from the respondents' customers would not be verifiable without the requested information from the Chinese government, Commerce would be unable to verify the respondents' claims of non-use even with full cooperation from respondents' customers.  *Id.* at 14.  Although Commerce stated that it would be unlikely to receive full responses from all the respondents' customers were it to attempt a verification in this manner, the statement was merely to illustrate the complications that such a verification would present.  *Id.*

## III.   Commerce Reasonably Determined That Verification Would Be Untenable And Unduly Burdensome Without The Information From The Chinese Government

As Commerce explained in response to the Court's questions, Commerce's inability to obtain information from the Chinese government regarding the 2013 revisions and the list of partner/correspondent banks renders Commerce unable to fully verify non-use of this program. *See* Remand Redetermination at 7-9.  If Commerce had this information, it would be able to limit the scope of loans reviewed at verification to the partner/correspondent banks, or at least to transactions above the USD 2 million threshold (if such a threshold were to still be in place).  *Id.* In its remand redetermination, Commerce also explained why verification of non-use of the

export buyer's credit program, absent additional information from the Chinese government, would not only be unsuccessful, but also unduly burdensome if Commerce were to attempt it.

Vogue claims that Commerce could verify non-use of the export-buyer's credit program, notwithstanding the missing information from the Chinese government, arguing specifically that Commerce could apply a "spot-check" methodology to determine if loans are disbursed pursuant to the program. *See* Vogue Cmts. at 26-28. Cooper Tire asserts that, in addition to the spot-check methodology, Commerce could verify the program by either individually reviewing every loan received by every customer, or by calling each of the customer's bankers during verification. *See* Cooper Tire Cmts. at 3-6.

Cooper Tire and Vogue are correct that Commerce often employs a spot-check methodology when verifying antidumping and countervailing duty respondents. *See Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (affirming Commerce's practice of using spot-checks); *NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (Ct. Int'l Trade 2002)). And, as Commerce explained, spot checks are a component of its typical loan verification process. Remand Redetermination at 25. However, as Commerce stated, the export buyer's credit program is atypical in that Commerce lacks the necessary information from the Chinese government required to understand how the program works, and specifically which types of loans it should spot-check. Because Commerce has no way of winnowing the loans received by a customer that may have potentially been received pursuant to the program, Commerce "might very well be wasting {its} time looking at loans that could not have been offered under the {export buyer's credit program}." *Id.* In addition, even if it were possible for Commerce to narrow the pool of loans to a group that may have been provided pursuant to the export buyer's credit program, Commerce's incomplete understanding of the

program would make it difficult for Commerce to ascertain whether a given loan is associated with the program or not. *Id*. at 27.

For similar reasons, it would be unrealistic to expect Commerce to verify every loan received by every one of the respondents' customers by contacting the banks themselves. Similar to the proposed spot-check methodology, this suggestion is complicated by the fact that Commerce has no indication of which loans are disbursed pursuant to the export buyer's credit program and would have no idea which banks to call. As Commerce identified in its Remand Redetermination, verifying every loan would, in addition to raising potential confidentiality concerns with the banks, "undoubtedly add to the complexity and the burden of the measures Commerce is asked to undertake to overcome the gap created by the {Chinese government's} failure to cooperate." Remand Redetermination at 35.

Vogue argues that other programs, such as import duty exemptions and purchases of inputs for less-than-adequate remuneration, have been verified by Commerce despite similar verification issues. *See* Vogue Cmts. at 26-27. In making such a comparison, however, Vogue omits a key distinction between those programs and the present situation – here, Commerce has no way of understanding how the export buyer's credit program works. As Commerce explained, in the case of underpriced inputs and import duty exemptions, Commerce can rely on its knowledge of the program, sometimes as a result of the Chinese government's cooperation, to "separate relevant from irrelevant transactions" and discern whether a given transaction is tied to the program in question. Remand Redetermination at 26-27.

Cooper Tire and Vogue argue that Commerce could nonetheless verify the mandatory respondents based on the evidence these parties provided in response to Commerce's questionnaires. *See* Cooper Tire Cmts. at 9; Vogue Cmts. at 11-13. Although Cooper Tire and

Longyue provided information that they claim contributes to a finding that neither entity used the export buyer's credit program, Commerce explained why such evidence is either irrelevant or unreliable.  Statements of non-use given by the respondents on behalf of the respondents and their customers are unreliable insofar as they cannot be verified due to the Chinese government's failure to cooperate.  *Id.* at 37.  The email correspondence provided by Longyue is likewise unreliable because Commerce has no means of confirming the total absence of communications.

As Commerce explained in its remand redetermination, communications may be employed to verify "assertions that do not rest on the complete absence of an event," such as the usage or existence of a program.  Remand Redetermination at 14.  Where, as here, Commerce is required to confirm that a program was not used, correspondence and communications "are not amenable to completeness tests."  Remand Redetermination at 15; *see also Changzhou Trina*, 195 F. Supp. 3d at 1354 (affirming Commerce's finding that "{Commerce} cannot typically look at the contents of a filing cabinet or binder and determine whether it includes everything that it is supposed to include").  Moreover, even if Commerce did have a means of verifying the *absence* of communications regarding the export buyer's credit program, it would be of limited use, as Commerce "does not know whether (under the current implementing regulations/administrative measures) such communications and correspondence are even required."  Remand Redetermination at 15.  Longyue's additional pieces of evidence – that it did not purchase export credit insurance, and that it did not offer any assistance to its customers – are also of limited utility, because Commerce cannot discern without the Chinese government's cooperation whether export insurance, or even the knowledge of the respondent, is necessary for disbursement of loans under the program.  *Id.* at 20-21.

Vogue argues that Commerce violated the requirements of 19 U.S.C. § 1677m(d) by failing to inform the mandatory respondents of the deficiencies in their non-use statements, and not offering the respondents an opportunity to cure those deficiencies. *See* Vogue Cmts. at 14-16. This misses the point. Commerce determined that verification of the export buyer's credit program would be unduly burdensome, if not impossible, *regardless* of the information received by respondents or the respondents' customers. *See* Remand Redetermination at 16-17, 21. Commerce found that any information provided by respondents would be futile because it still would not permit verification absent the information requested of, but not provided by, the Chinese government. Accordingly, Vogue's argument with respect to the requirements of 19 U.S.C. § 1677m(d) is misplaced.

Vogue also suggests that Commerce can verify non-usage of the export buyer's credit program by further examining the mandatory respondents, their United States customers, and/or the China EX-IM Bank. *See* Vogue Cmts. at 17-23. As we explained above, and as Commerce demonstrated in its remand redetermination, it would be both impractical and not particularly useful for Commerce to verify the mandatory respondents or their customers. As to the China EX-IM Bank, Commerce has acknowledged that verification of the program by examining the China EX-IM Bank would be "the most straightforward means of verifying," *but only if* Commerce were allowed "unfettered access to the EX-IM Bank's database." Remand Redetermination at 19. So far, the only access to the China EX-IM Bank that has been granted to Commerce has come in the form of screenshots of search queries made in the China EX-IM Bank internal database. P.R. 73 at 129-130. As this Court has recognized, these screenshots are no substitute for the information that Commerce has requested regarding the China EX-IM Bank. *See Cooper Kunshan Tire Co.*, 539 F. Supp. 3d at 1331. Further, the Chinese government's

failure to provide Commerce access to the China EX-IM Bank in this and in past proceedings does not portend well for full cooperation from the China EX-IM Bank in the event of a verification. *Id*. at 1333-1334.

Cooper Tire and Vogue additionally claim that Commerce's remand redetermination cannot be reconciled with Commerce's past practices. *See* Cooper Tire Cmts. at 2; Vogue Cmts. at 4-9. Both parties argue that Commerce's final determination in *MAE from China*, and its final determination in *VSE from China*, constitute practice that is irreconcilable with Commerce's remand redetermination in this case. *See Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) (final results) (*MAE from China*) and accompanying IDM; *Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China*, 86 Fed. Reg. 14,071 (Dep't of Commerce Mar. 12, 2021) (final results) (*VSE from China*) and accompanying IDM. These arguments lack merit.

As a preliminary matter, we do not read the Court's remand order in this case as requiring Commerce to actually undertake verification proceedings regarding the export buyer's credit program. *See* Remand Redetermination at 28. Moreover, those administrative determinations do not bind Commerce's ability to make a determination based on the facts on the record of this proceeding. *Id*. Commerce's determination in *VSE from China* contained unique facts that permitted Commerce to make a finding of non-use of the export buyer's credit program based on a factual inference. Specifically, the respondent in question only had one customer, its parent company, during the period of investigation, and the respondent was able to provide documentation establishing that each of that company's financing instruments could be tied to "specific purposes not related to the export of goods from China." *VSE from China* IDM at 22-

23. Because the same cannot be said of the responses received by Commerce from respondents in this case, Commerce is not compelled to come to the same conclusion in this determination as it did for the respondent in *VSE from China*.

*MAE from China* is likewise uninstructive. Although Commerce ultimately recognized that the respondents in *MAE from China* did not use the export buyer's credit program, this finding was made in recognition of the fact that the Court had "directed Commerce in numerous decisions to consider whether any available information provided by respondents may be sufficient to fill the gap of missing record information in considering claims of non-use" of the export buyer's credit program. Remand Redetermination at 29. And Commerce recognized in *MAE from China* that certain concerns and issues were raised that would have benefitted from an onsite (as opposed to remote) verification of the respondents' records. Finally, Commerce's finding of non-use by the respondents in *MAE from China* was contingent on Commerce having received non-use certifications from the respondents' customers. Remand Redetermination at 30; *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 41,013 (Dept. of Commerce July 30, 2021) (preliminary results), and accompanying Preliminary Decision Memorandum at 21. Because Commerce did not receive certificates, or any other correspondence, from the respondents' customers in this review, the facts of *MAE from China* are inapposite to the present case.

Finally, Vogue asks this Court to consider the United States' recent motion for voluntary remand in a separate litigation, *Risen Energy Co. v. United States*, Consol. Court No. 20-03912, ECF 83. That motion, however, is not on the record of this dispute and concerns a different case regarding a different product and different factual scenario. In its motion in *Risen Energy*, the Government, in response to the particular events underpinning that litigation, merely requested

the Court's leave for Commerce to consider whether any of its recent proceedings would

necessitate a different outcome in that case, and did not indicate how it would carry out a remand

redetermination, or what outcome it would reach, if the motion were to be granted. *Id.*

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's Remand

Redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

/s/Sosun Bae
SOSUN BAE

Of Counsel:

SPENCER NEFF
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
United States Department of Commerce

Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Email: sosunbae@gmail.com

*Attorneys for Defendant*

May 19, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,092 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/Sosun Bae</u>
Sosun Bae

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of May, 2022, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/ Sosun Bae</u>
Sosun Bae